```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK



----------------------------X
                             :
STATE FARM MUTUAL AUTOMOBILE :
INSURANCE COMPANY,           :
                             :    10-CV-3848(ILG)(RML)
             Plaintiff,      :
                             :    January 9, 2012
        v.                   :
                             :    Brooklyn, New York
JOHN McGEE, et al.,          :
                             :
             Defendants.     :
----------------------------X
```

```
       TRANSCRIPT OF CIVIL CAUSE TELEPHONE CONFERENCE
           BEFORE THE HONORABLE ROBERT M. LEVY
              UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Plaintiff:          JONATHAN MARKS, ESQ.
                            EMILY J. PRENTICE, ESQ.

For the Defendants:         MARIA DIGLIO, ESQ.
                            EDWARD BLODNICK, ESQ.
                            EUGENE LEVY, ESQ.
                            ANTHONY MAMMO, ESQ.
                            GARY BERGOON, ESQ.

For the Movant:             JAY SHAPIRO, ESQ.

Audio Operator:

Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE CLERK:  This is Docket Number 10-CV-3848,

2   State Farm v. McGee et al.

3          Would counsel please state your appearances for

4   the record.

5          MR. MARKS:  Jonathan Marks and Emily Prentice on

6   behalf of plaintiff State Farm.  Good afternoon, your Honor.

7          THE COURT:  Good afternoon.

8          MS. DIGLIO:  This is Maria Diglio and Edward

9   Blodnick for Dr. McGee and the PC defendants.

10          MR. LEVY:  This is Eugene Levy for Emilio Paez and

11   Fresh Meadows Management and Medical Management Center.

12   Good afternoon.

13          THE COURT:  Good afternoon.

14          MR. MAMMO:  Your Honor, this is Anthony Mammo for

15   Humberto Romero and his PC defendants.

16          MR. BERGOON:  This is Gary Bergoon for the

17   Ilyaichs and the management entities: Alternative Program

18   Queens, Executive Corp., Sion Marketing, and London Billing.

19   Good afternoon, your Honor.

20          THE COURT:  Good afternoon.

21          MR. SHAPIRO:  Jay Shapiro for non-party National

22   Insurance Crime Bureau.

23          THE COURT:  Good afternoon.

24          Okay.  Who would like to go first?  Maybe I should

25   hear from plaintiffs first.

```
1              MR. MARKS:  Sure, your Honor.  We have a number of

2    items that are before the Court, but I think Mr. Mammo has

3    to get off the call, so I thought we'd go through those that

4    concern all parties that concern him first so that we can

5    address his scheduling.

6              THE COURT:  Okay.

7              MR. MAMMO:  Thank you.

8              MR. MARKS:  The first item is relatively quick and

9    it is directed to all parties, and that is State Farm has

10   filed a motion to extend the expert discovery cutoff.  Last

11   time we had been before the Court, the Court granted our

12   motion to extend the fact discovery cutoff, and we just

13   neglected to include the expert discovery cutoff as well.

14   Our motion just extends that cutoff the same amount of time

15   as the fact expert cutoff, so it would move it until

16   November 1, 2012.  The fact cutoff is currently June 30,

17   2012.

18             THE COURT:  And this is on consent?

19             MR. MARKS:  Well, we filed a motion.  We have not

20   heard any objection since we filed the motion.  The parties

21   will have to state whether they consent or object.

22             MR. LEVY:  Your Honor, Mr. Paez and his management

23   companies, we consent.

24             MR. BLODNICK:  McGee defendants don't have any

25   objection.
```

1          MR. MAMMO:  Neither do the Romero defendants.

2          MR. BERGOON:  Neither do the Ilyaich defendants.

3          THE COURT:  Have I heard from everyone?

4          MR. BERGOON:  I think you have.  Mm. Yes, your

5    Honor.

6          THE COURT:  So it is, in fact, on consent.  All

7    right.  The application is granted.

8          MR. MARKS:  Next, your Honor, State Farm has a

9    motion with respect to the Romero defendants.  There is

10   essentially one relatively minor item that remains

11   outstanding.  Mr. Mammo has actually gotten us some

12   materials.  We need to resolve one issue.  We expect to get

13   it resolved in short order and file something with the Court

14   withdrawing our motion.

15         So at this time on the Romero motion, we'd ask

16   that it entered and continued again because we expect to be

17   able to resolve that shortly.

18         THE COURT:  On consent?

19         MR. MARKS:  Yes.   Yes, your Honor, on consent.

20         THE COURT:  All right.  Application granted.

21         MR. MARKS:  The next one I don't know whether it

22   concerns Mr. Mammo or not, but I guess I will turn to it,

23   and that is, we have a motion to compel Ridgewood Medical.

24         Ridgewood Medical, we believe -- we think it's

25   jointly owned by defendant Romero and defendant Paez.  We

1    have successfully served a subpoena on Ridgewood Medical.

2    It has not responded to the subpoena.  When we have

3    contacted them at their offices, they tell us: We get the

4    subpoena; we hand it to Mr. Romero, but we understand that

5    Mr. Romero claims not to own it or claims not to be

6    responsible for it.

7            MS. PRENTICE:  He claims not to have any documents

8    responsive to the subpoena in his possession, custody, or

9    control.

10           MR. MARKS:  And we've not heard from Mr. Paez.

11   The problem is this:

12           We need someone to step forward and say they're

13   responding on behalf of Ridgewood, a duly served subpoena,

14   and that hasn't happened yet.  Perhaps, now that we have

15   counsel for Mr. Romero on the phone and we have counsel for

16   Mr. Paez both on the phone, maybe someone can address to

17   whom we should be directing this because we're at a loss.

18           MR. MAMMO:  Judge, maybe I can shed a little bit

19   of light on it.  This is Tony Mammo for Romero.

20           THE COURT:  Yes.

21           MR. MAMMO:  Essentially, my understanding in

22   speaking with my client, and I haven't seen any of the

23   documentation, but I did speak with him twice on this issue,

24   apparently Mr. Romero and Mr. Paez created this entity known

25   as Ridgewood.  All they did was simply create the entity and

1   file for a license to do business with the state, but they

2   never received a license; so, they essentially never

3   conducted any business.  They didn't do any medical billing.

4   The corporation really never -- although, it existed, it

5   never did any business.

6         So when I asked Mr. Romero if he had the records,

7   he told me no, that Mr. Paez had the records, and that was

8   -- unfortunately, that was last week.

9         So I did speak with Emily Prentice.  I did send a

10   letter to counsel for State Farm indicating what I just

11   described to the Court.  I then spoke with Emily, and she

12   asked me to give her a letter indicating that I would be

13   appearing or responding on behalf of Ridgewood, but I felt

14   that I should first speak with Paez's attorney about that to

15   see which of us was going to put in that appearance and then

16   respond to the subpoena.

17       MR. LEVY:  I'm not aware of any ownership interest

18   on Paez part for Ridgewood.  I'll have to speak to him about

19   it.

20       MR. MAMMO:  Okay.  What I suggest is counsel and I

21   -- counsel for Paez and counsel for Romero. we can speak

22   after the conference, and then one of us will send a

23   response indicating we are responding to the subpoena on

24   behalf of Ridgewood and giving our answer.  If there are any

25   records, we'll give them the records.  If not, we'll

1   indicate either by signature by counsel or an affidavit from

2   one of the principals what happened with this company.

3              THE COURT:  When will you do that?

4              MR. MAMMO:  Pardon me?

5              THE COURT:  When will you do that?

6              MR. MAMMO:  I can do that by the end of next week,

7   Judge.

8              THE COURT:  Okay.  Mr. Marks?

9              MR. MARKS:  That's absolutely agreeable.  So if

10  the Court would be willing to order compliance with the

11  subpoena by Ridgewood by the end of next week, that is

12  absolutely agreeable.

13             MR. MAMMO:  Again, it will either be (a) we have

14  records and we're going to get them to you.  I don't know

15  that I can get records by the end of next week, but it will

16  be, yes, we have records and we'll get them or (b) there are

17  no records and here's either an affidavit or a letter from

18  counsel indicating that there are no records.

19             MR. MARKS:  I guess what I would ask, if there

20  were to be records and you were to produce records, how much

21  time would you need to produce records so that we can

22  essentially have an order, so we don't have to come back and

23  forth to the Court.

24             MR. MAMMO:  I understand.  I don't know.  Are we

25  setting a followup date, so that maybe I can -- I want to

1    say a month.  I just don't know.  I understand Mr. Paez

2    packed up his offices and moved them to Puerto Rico, so I

3    don't know if the records are in Puerto Rico or in a box in

4    storage somewhere in Long Island.  I don't know yet.  My

5    understanding is Romero does not have any records, but I

6    have to check.   So I would say at least thirty days.

7              THE COURT:  Mr. Marks?

8              MR. MARKS:  Thirty days seems long, but if it's

9    thirty days and we're done, then I guess that's fine.  If

10   we're going to have compliance with the subpoena within

11   thirty days by Ridgewood, I guess that's fine.

12             THE COURT:  Okay.  So let's just be clear.  Thirty

13   days is what date?

14             MR. MARKS:  February 2.

15             THE COURT:  No, we're the 9th today.

16             MR. MARKS:  I'm sorry, yes.  It would be like

17   February 9 or 10.

18             THE COURT:  We'll say the 10th.

19             MR. MARKS:  I would just say February 10, Judge.

20             THE COURT:  Yes.

21             MR. MARKS:  Thank you.

22             THE COURT:  So the Ridgewood subpoena issue is

23   resolved.  There will be a response to the subpoena by the

24   23rd of January and compliance by the 12th (sic) of

25   February.  I'm sorry, by the 10th.

```
 1              MR. MARKS:  Thank you.

 2              THE COURT:  Okay, next.

 3              MR. MARKS:  Next, we -- so those are the issues

 4    that concern Mr. Mammo.

 5              MR. MAMMO:  Thank you.  I will stay on the call

 6    until about quarter to three, then I have to go.

 7              THE COURT:  Okay.

 8              MR. MARKS:  Let's do some that are easy.  We have

 9    a motion to compel Dr. Davi.  That motion can be withdrawn.

10    He has now complied with the subpoena and we withdraw that

11    motion.

12              THE COURT:  Okay.

13              MR. MARKS:  Next, we have motion to compel the

14    Paez defendants, that's Paez, Fresh Meadows -- I'm sorry,

15    it's the motion for default judgment against Paez, Fresh

16    Meadows, Medical Management Affiliate.  I think the Court is

17    well-aware of the history with respect to this particular

18    motion.  There have been two orders requiring compliance.

19    The last order required compliance by December 16, and

20    failure to comply by that date was on pain of sanction.

21              We have had some attempt at compliance since the

22    last hearing.  So some records have been provided.

23    Compliance is, at this point, not complete.  However, we do

24    acknowledge that there has been some effort, and so we would

25    appreciate that the Court might be disinclined to enter a
```

1  default given the effort that have been made.  However, we

2  are at this point -- it's been a year since this discovery

3  has been served.  We have be going at this a long, long

4  time, and there have been dates extended again and again and

5  again.

6       So with respect to this one, what State Farm would

7  be asking for is we would ask that compliance be complete

8  within seven days, that the Court set monetary sanction for

9  everyday after those seven days that the production is not

10  complete, and that we be awarded a monetary sanction for the

11  expenses and time that State Farm has incurred in having to

12  address this in the amount of $2,000.

13       MR. LEVY:  Judge, this is Gene Levy here.  I have

14  been sending the paperwork as I have gotten it.  As other

15  counsel has said, my client is in Puerto Rico.  The records

16  and information we've been getting from sources in New York.

17  It's been painstaking, but I think my client has tried.  If

18  we could have a little bit more time than seven days.  I

19  know that Mr. Marks has a subpoena into his banks for

20  records.  We have told the banks to issue the materials.

21  We're also looking for the same materials ourselves.

22       THE COURT:  So you're asking for two weeks?

23       MR. LEVY:  Two weeks would be wonderful, Judge.

24       THE COURT:  All right.  That will be final though,

25  and there will be sanctions imposed if there is not

1   compliance by those two weeks.

2           MR. LEVY:  All right, Judge.  Judge, I'm actually

3   engaged on trial right now.  I was supposed to be down by

4   the courtroom in Queens Supreme about 15 minutes ago, if I

5   can be excused now.

6           THE COURT:  Yes, I'm sorry for the delay here.

7           MR. MARKS:  Judge, before Mr. -- I understand the

8   Court's ruling.  Is the Court going to reserve ruling on

9   what those sanctions are.  Would the Court consider

10  identifying what those sanctions would be?  I feel like

11  we've been down this road a little bit with this particular

12  defendant, with both.  If the Court would consider

13  identifying what those sanctions might be at the end of two

14  weeks?

15          THE COURT:  I'm inclined to accept your

16  recommendation, but I will make a final ruling at the time

17  when I've had a little more time to think about it.  It

18  doesn't seem unreasonable that there be $2,000 in costs and

19  that there would be a daily sanction, monetary sanction, for

20  failure to comply.

21          MR. MARKS:  Okay, thank you.

22          THE COURT:  That does not seem unreasonable.

23          MR. LEVY:  Thank you, Judge.  This is Gene Levy.

24  I'm signing off.

25          THE COURT:  Okay.  Mr. Marks, this is for

1  defendants Paez, Fresh Meadows Management, Inc.  What was

2  the third?

3           MR. MARKS:  Medical Management Affiliated LLC.

4           THE COURT:  Got it.

5           MR. MARKS:  Judge, that takes us then to the

6  Ilyaich defendants --

7           THE COURT:  Yes.

8           MR. MARKS:  -- who actually find themselves in a

9  similar situation.  Again, there have been two orders issued

10  by this Court.  The second of those orders required

11  compliance by December 16 or on pain of sanction.  The

12  Ilyaich defendants have also made some efforts, but again

13  their compliance is also not complete.  We're asking for the

14  same thing with respect to them.  We're asking for

15  compliance, in their case, in seven days as well with the

16  same monetary sanctions on a daily basis should they not

17  comply and for our costs.

18           MR. BERGOON:  Judge --

19           THE COURT:  Yes.

20           MR. BERGOON:  -- we have in our -- we have stated

21  that my clients have given everything that they have.  Any

22  other documents are in the hands of the accountants, which

23  one of them was subpoenaed by State Farm anyway.

24           Jonathan, I don't know if he sent you documents

25  yet, Mr. Nastall (ph).

1          MS. PRENTICE:  I don't believe we've received

2     documents from him yet, but I think that we have been in

3     contact with his office.

4          MR. BERGOON:  Mr. Nastall, any of the other

5     remaining documents that have been requested would be in the

6     hands of Mr. Nastall, if he has these.  Other than that, my

7     client doesn't have any documents or anything else.

8          Some of the requests concern medical records,

9     which would be in the hands of the defendant Dr. McGee.  He

10    wouldn't have anything to do with medical records.  That's

11    where we are.

12         Your Honor, I'm trying my best to get everything

13    that they request to them through the accountant, and that's

14    where we are right now.

15         MR. MARKS:  We don't have written responses to the

16    document requests, so this is really the first we've heard

17    that you don't have documents responsive, you don't have

18    anymore documents responsive or that the documents are in

19    the possession of someone else.

20         Look, we're not asking you to create documents

21    that don't exist.  So if full compliance means a document

22    response that says: we have produced any and all responsive

23    documents, then that's fine.  Do it and provide it.

24         MR. BERGOON:  All right.

25         MR. MARKS:  We just ask that it get done within

1    seven days.  That shouldn't be too hard to do.

2              MR. BERGOON:  Is Mr. Shapiro still on the line?

3              MR. SHAPIRO:  I am.

4              MR. BERGOON:  Jay, did I give you a document

5    response with the documents when I first gave them to you?

6              MR. SHAPIRO:  You would have to ask Mr. Marks and

7    Ms. Prentice that.  I don't recall.  I don't know the state

8    of the file.

9              MR. BERGOON:  All right.

10             MS. PRENTICE:  We don't have any record of ever

11   having received written responses to --

12             MR. BERGOON:  I'll check to see if it was sent

13   out.  If not, then, Jonathan, I'll do a response to the

14   document request then.  I thought it was sent out to the

15   Bureau, but --

16             MR. MARKS:  The bottom line is our letters to

17   court and our letter to counsel identifies what we believe

18   to be things that are missing from the discovery.

19   Defendants either have them or they don't.  We just ask that

20   it either be provided or we're told it doesn't exist, and

21   we're asking that that happen in seven days.

22             MR. BERGOON:  Jonathan, if we talk to the

23   accountant Nastall, we'll have to determine what he still

24   has, if anything.  It would be easier for me to respond if I

25   know that he has certain documents that you are looking for.

1    Whether he does that in seven days, I don't know.  I don't

2    know what the holdup is with him.  So if you and I want to

3    work something out with him directly, and then I can respond

4    after we see what he gives you, I think that would be

5    easier.

6              MR. MAMMO:  If I could just interrupt.  This is

7    Anthony Mammo for the Romero defendants.  If I'm not needed,

8    I'm just going to sign off.

9              THE COURT:  You're not needed from the Court's

10   perspective.

11             MR. MAMMO:  Thank you, sir.  Good day.

12             MR. MARKS:  I guess I'm not --

13             MR. BERGOON:  I'm doing the best I can with all

14   this.  Again, I don't know what Nastall has at this point

15   because he hasn't given me a list of what he's given you,

16   but I will call him today and find out where he is with his

17   document production for you.  That way I'll know if there's

18   any additional document that I did not already give you.

19             MS. PRENTICE:  Gary, I'm speaking off the cuff.  I

20   don't have access to the produced records in front of me.  I

21   don't know for certain that Nastall hasn't responded yet.  I

22   would have to double check that.  But I understand from your

23   interrogatory responses, in any event, it sounds like there

24   was more than one accountant who provided services to your

25   client, and I don't think we subpoenaed the other

1  accountant.

2          MR. BERGOON:   Mr. Charles.  I gave you his -- the

3  documents he gave me I gave to you.

4          MS. PRENTICE:  Okay.

5          MR. BERGOON:  So maybe you should subpoena him too

6  then, if there is anything additional.  He told me that's

7  all he had regarding all these defendants.

8          MR. MARKS:  I don't know that we need to burden

9  the Court with our back and forth of what is missing or may

10  not be missing.  I think, as we said, we have identified in

11  our letters both to the Court and to counsel those things

12  that we think are missing.  Defendants either have them or

13  they don't.  If they don't have them, tell us they don't

14  have them in a response.  If they do have them, get them to

15  us.  We would ask that that happen in seven days.  If it

16  needs to be 14, we understand the Court's order with respect

17  to Paez, that's fine too; but, let's just set a deadline by

18  which it gets done.

19          MR. BERGOON:  All right.  That's fine, Jonathan.

20          MR. MARKS:  So that's what we're asking the Court

21  to do for us is set, and let's just get it done.  That's

22  where we are.

23          THE COURT:  What are you offering to do at this

24  point?

25          MR. MARKS:  I guess what I'm asking is, I'm asking

1    that it get done in seven days, and that if it's not done in

2    seven days that the Court impose a monetary sanction for

3    every day thereafter it's not done and costs.  We will work

4    with Mr. Bergoon within those seven days to try and get it

5    done.

6            MR. BERGOON:  Okay, seven is fine.  I'll just get

7    it done with him and I'll get a response to you one way or

8    the other.

9            THE COURT:  Okay.  So ordered.

10           MR. BERGOON:  All right.

11           MR. MARKS:  Next, State Farm has a motion to

12   compel Dr. Rigney (ph) and Diagnostic Radiographic Imaging

13   or DRI.  Is there anyone on the phone regarding that non-

14   party?  There does not seem to be.  That is an instance,

15   your Honor, in which we have received one category out of

16   two that are identified in the subpoena.  What we require in

17   terms of full compliance is either that the second category

18   of records be produced or that we be told that they don't

19   have any.

20           So with respect to that subpoena, we're just

21   asking that they be ordered to comply within seven days.

22           THE COURT:  Who is responding on that?

23           MR. MARKS:  There doesn't appear to be anyone who

24   is on the call.  We have served them with the subpoena.  We

25   have served them with the motion, and we have served them

1    with the call-in information.  So they're on notice.

2              THE COURT:  Have we had anyone appear?  Who are

3    these defendants again or these parties?

4              MS. PRENTICE:  They're third parties, Dr. John

5    Rigney and Diagnostic Radiographic Imaging, it's his entity.

6    They are represented by counsel, but he apparently decided

7    not to call in today.

8              THE COURT:  Okay.

9              MS. PRENTICE:  He was provided with the call-in

10   information.

11             THE COURT:  Who is his counsel generally?

12             MS. PRENTICE:  His name is Timothy McColgan (ph).

13             THE COURT:  Okay.

14             MR. MARKS:  What I can suggest, your Honor, one of

15   the things you have done in the past in this instance is --

16   I guess I would ask, if you want to set a date by which they

17   must comply and given them a certain number of days short of

18   that date by which they can -- to show cause why they should

19   not be required to comply.

20             THE COURT:  Okay.

21             MR. MARKS:  So if you want to require them to

22   comply in ten days and have them show cause in five.

23             THE COURT:  Yes.  I'll do that as business days.

24   So we'll say comply by January 24 and show cause by January

25   17.  We have a holiday in between.  Okay, and that's for

```
1    John Rigney and Diagnostic Radiographic Imaging?

2               MR. MARKS:  Yes, your Honor.

3               THE COURT:  Okay, thank you.

4               MR. MARKS:  Next then, we have a motion to compel

5    subpoena responses by Diagnostic Plus.  This is an entity

6    that we have served a subpoena on.  We have received no

7    response to the subpoena and have actually, really, not

8    heard from anybody, but it is a validly served subpoena.  In

9    this case, as well, we need and order compelling compliance

10   with the subpoena by a date certain.

11              THE COURT:  Okay.  You're satisfied they've been

12   served and that they're aware of it?

13              MR. MARKS:  We are satisfied that they have been

14   served and we've served them with a copy of the motion.

15              Now, what's happening when it's getting there is

16   anybody's guess, your Honor, but we have served at a valid

17   address for the entity.  Yes, we're satisfied of that.

18              THE COURT:  He filed the affidavit of service or

19   some proof of service?

20              MR. MARKS:  One moment.  We're checking, Judge.

21              MS. PRENTICE:  Yes,  your Honor.  The affidavit of

22   service was attached to our motion, Docket Number 70.

23              THE COURT:  Seventy, okay.  Thank you.  Okay.  So

24   seven days?

25              MR. MARKS:  That would be great.
```

1            THE COURT:  So that would be the 17th.  Oh, we'll

2     make it the 18th because of the holiday, January 18.  Okay.

3            MR. MARKS:  Thank you, your Honor.  I think that

4     brings us to our motions with respect to the McGee

5     defendant.

6            THE COURT:  Okay.

7            MR. MARKS:  With respect to the McGee defendant,

8     State Farm has a motion to compel.  We originally raised

9     that motion a number of -- I guess I'll call them "small

10    issues" with respect to particular discovery items.

11           We're in conversation with the defendants about

12    those.

13           THE COURT:  Okay.

14           MR. MARKS:  I think we're going to be able to work

15    most of those out and we'll address those.  The ones that we

16    need the Court to address today are the three objections,

17    which we're going to ask the Court to rule on that deal with

18    (1) personal tax returns and bank records; (2) records

19    regarding ownership and income at other clinics; and (3) Dr.

20    McGee's pocket diary.  All other aspects of that motion I

21    think the parties are going to try and work out and will get

22    back to the Court on.

23           We've briefed those three issues.  I can speak to

24    them directly, if the Court would like.

25           THE COURT:  Why don't you since we're on the

```
 1   record.

 2              MR. MARKS:    Sure.

 3              MR. SHAPIRO:  Judge?

 4              THE COURT:  Yes, go ahead.

 5              MR. SHAPIRO:  This is Jay Shapiro.  I represent a

 6   non-party, and in all respect to Mr. Marks, is there any way

 7   that we could discuss the NICD subpoena before we hear

 8   further argument?

 9              THE COURT:  Sure.  Absolutely.  Go ahead.

10              MR. SHAPIRO:  I think I could be brief on this.  I

11   spoke to Mr. Blodnick on Friday.  Mr. Blodnick, who I'm sure

12   will correct me if I say something incorrect, told me --

13   gave me some specifics about what Dr. McGee is looking for

14   in terms of NICD information.  He informed me -- I

15   understand now what has been produced thus far, and I'm not

16   going back to my client to find out exactly what, if

17   anything, was disseminated to State Farm from NICD.  With

18   that renewed focus and more narrow focus, I will get back to

19   Mr. Blodnick hopefully by next Friday with some more

20   information.

21              So our motion to quash is still out there.  We

22   have not withdrawn that.  But, depending upon what I find

23   out from the client, in light of what Mr. Blodnick said,

24   maybe we can resolve or at least narrow our motion to quash.

25              MR. BLODNICK:  Your Honor, this is Ed Blodnick.  I
```

1  have no problem with anything Mr. Shapiro said.

2           THE COURT:  Okay.  So what would you like the

3  order to say?

4           MR. BLODNICK:  I would like the order to say --

5           MR. SHAPIRO:  Go ahead.

6           MR. BLODNICK:  Put it off I guess -- how long,

7  Jay, one week, two weeks?

8           MR. SHAPIRO:  Yes, put it off for two weeks.  You

9  and I will confer before then.

10           THE COURT:  Okay.  So two weeks and the holiday

11  would be January 24.

12           Did you want to just advise me what the result is

13  then or do we need a conference?

14           MR. SHAPIRO:  Sure.  No, we don't need a

15  conference.

16           MR. BLODNICK:  (ui) we'll do a joint letter about

17  what we discuss.  Is that fair enough, Jay?

18           MR. SHAPIRO:  As long as you write the letter,

19  absolutely.

20           MR. BLODNICK:  Okay.

21           THE COURT:  Yes, but then you get to determine the

22  content.

23           MR. SHAPIRO:  I trust Ms. Diglio.  Thank you then,

24  Judge.  I appreciate it.

25           THE COURT:  Okay.  So back to the McGee

1    defendants.  Should we start with the tax returns and bank

2    records?

3         MR. MARKS:  Sure.  Your Honor, it's State Farm's

4    position that we need these records for a number of reasons.

5    State Farm intends to use these records.

6         As the Court is aware, among the critical issues

7    in this case is, what portion of the profits or income from

8    the PC defendants did McGee receive, and what portion of the

9    profits from the PC defendants did the lay owners or the

10   true owners of these PCs, what we allege to be the true

11   owners, the managers, receive?  If the managers received the

12   lion's share of the profits, that would tend to show that

13   they were the owners and controlled it.

14        We allege that the way in which these managers

15   received these profits and hid their receipt of these

16   profits was that they collected them in the form of

17   management fees, that they were paid ostensibly as fees from

18   management services, but was really the way in which they

19   siphoned the profits out of the business and pocketed them.

20        So what are the ways in which we're going to go

21   about showing that.  One of the ways we're going to go about

22   showing that is, well, how much income did Dr. McGee report

23   having received from the PC defendants.  One place we're

24   going to go look for that is on his tax returns.

25        Now, the defendants respond: well, you don't need

1    his tax returns.  You can look at the bank records, and the

2    bank records will show you how much money he got from the PC

3    defendants, or you can look at the tax returns of the PC

4    defendants and that will tell you how much; but, that is not

5    complete and that is not sufficient.

6        Number one, we don't know, just because we saw a

7    check written to Dr. McGee, that he got that money.  We

8    don't know that that money went into his account because

9    they don't want us to see his personal bank records.  We

10   also don't know whether he got money in some other way,

11   other than a check that may have been written to him.  And

12   we also don't have to accept, are entitled to check the

13   accuracy of these documents, to compare what one tax return

14   looks like to another tax return.  In fact, it's our

15   allegation that the lay persons control the PCs.

16       So what the businesses records look like and

17   Dr. McGee's personal records look like, how they may be the

18   same and how they may be different, is an important

19   component of this scheme and an important thing we need to

20   figure out.  Ultimately, the critical fact is not the

21   dollars that McGee may have received because McGee could

22   have received gas money for reimbursement for driving to and

23   from the clinic, but it's what is his income.  What is he

24   preparing to declare under penalties that apply to people

25   who sign tax returns under oath.  What does that show he is

1    declaring as income.

2          Remember, we're entitled to test his credibility

3    that the document that he has signed under the penalties of

4    a tax return.

5          Additionally, we want to show how much of McGee's

6    income comes from the PC versus how much comes from other

7    sources.  Now, we say that's because we want to show whether

8    he is beholding to the managers.  They say, well, who cares;

9    that's not relevant whether he's beholding to the managers.

10         It is certainly well-established law and it's

11   certainly allowed.  We have cited in our response brief the

12   case law on the relevance of motive.  The jury is entitled

13   to know why in the world would a doctor with a license who

14   can practice medicine turn over his medical clinic to lay

15   people.  Why would he let them tell him what to do.  Why

16   would he order tests that they direct him to.  Why would he

17   prescribe procedures that put money in their pocket.

18         One the reasons we expect to be able to show is

19   because he depended on them for his livelihood because the

20   money he got from them was a significant portion of the

21   money that he made in any particular year.  The fact that he

22   was beholding, the fact that he was motivated to do what

23   they said.  Motive is a relevant piece of evidence and

24   something we're entitled to show the jury and that will be

25   shown from these documents.

1          Finally, we want to be able to show how Dr.

2    McGee's financial arrangements with this clinic, the clinics

3    that are a subject of this case, varied with other clinics.

4    The defendants respond and say, well, who cares what happens

5    at other clinics.  All you've got to show is, did McGee own

6    these clinics.

7          One of the issues is he is going to claim he got

8    this basket of services from the managers, and he's going to

9    claim that he paid fair market value.  You know, they did

10   his photocopying, they scheduled his appointments, and he

11   paid the fair market value for those services.

12         Well, what did he pay for those services at some

13   other location.  Did he pay a lot less.  Did he get a

14   greater percentage of profits at another location.  If he

15   did and he was paying a lot more at these clinics that are

16   the subject of this case, that would tend to show that the

17   reason he was doing it is because he wasn't paying fair

18   market value at the clinics that are at issue in this case.

19   The profits were being siphoned and that is why it is

20   relevant.

21         So for those reasons we ask that the personal tax

22   returns and bank records be produced.  I will note that so

23   far all of the other defendants in this case have produced

24   their personal tax returns.  Most of them have produced them

25   and we have no objection to them.  So for those reasons we

1   ask the personal tax returns and bank records be produced,

2   your Honor.

3          MR. BLODNICK:  This is Edward Blodnick, your

4   Honor.  May I speak now?

5          THE COURT:  Yes, please.

6          MR. BLODNICK:  First of all, let's start at the

7   beginning.  Between the management tax returns and the PC

8   tax returns, he could determine how much was taken out by

9   Dr. McGee because the amount taken out by Dr. McGee on his

10  PCs would either be shown as a W-2 income, 1099 income, or a

11  K-1, if it was a Sub-chapter S.  In any one of the three

12  cases, the total amount of income earned by Dr. McGee would

13  be shown the PC tax return.

14         Furthermore, if they wanted to see whether Dr.

15  McGee actually received the checks that were made out to

16  him, they have a right to look at all the checks from the

17  bank accounts of the PCs and see if the back of those

18  checks, whether they were actually deposited in Dr. McGee's

19  account.  So that part of the argument is ridiculous.

20         The second part of it is to see how much the

21  management companies make would be to look at their tax

22  returns.  Now, let's go to the second thing that they're

23  asking for.  They want to look at all Dr. McGee's other

24  companies.

25         THE COURT:  Just a minute.  I think there was one

```
1   other argument that Mr. Marks is making and that is that
2   there nay have been payment in some other form other than in
3   checks.
4           MR. BLODNICK:  All right.  Let's assume that Dr.
5   McGee got cash in addition to -- cash or other remuneration,
6   that would only help us and show that Dr. McGee got more
7   money and earned more money, and it certainly would not hurt
8   Dr. Marks' (ph) position that Dr. McGee was under
9   compensated for what he did.  So the fact that Dr. McGee
10  made more money is not relevant.  All they're trying to show
11  is Dr. McGee got disproportionately less share of the money
12  not a greater share of the money.  If Dr. McGee got all the
13  money and the management company got nothing, we wouldn't be
14  sitting here talking now.
15          So the fact that Dr. McGee may have gotten
16  additional compensation is not relevant to their case.  It
17  may be relevant to our defense, but it's not relevant to
18  their case.
19          Now, let's go to the other entities.  What he's
20  asking you to do, your Honor, is he's asking us to produce
21  each and every entity that Dr. McGee is involved in, make a
22  business analysis of each of those companies, see if we have
23  the same management arrangements, the same services, the
24  same amount of time, and he's asking the Court to get
25  involved in the business analysis of every bit of business
```

1    Dr. McGee does.  I've been involved in at least twenty of

2    these RICCO cases, and I've never heard of a request like

3    this.  This is well beyond the scope of any reasonable

4    thing.  If they need this information, what they should do

5    is hire themselves an expert and say that the amount of

6    compensation that Dr. McGee paid the management company is

7    unreasonable and excessive.  He's really trying to make us

8    use our comparables as experts for him.  This is not proper

9    discovery.  It's well beyond anything to do with this case.

10           You can't just look at the tax returns.  You have

11   to see what services.  So that means you're going to hold

12   depositions about the services that Dr. McGee for every

13   business he's involved in and see if it's comparable to the

14   services he got in the PCs that are in this lawsuit.  This

15   is so far beyond the realm of reason that it should be

16   denied summarily.

17           THE COURT:  I'm sorry.  Is this a relevance

18   argument, a burden argument, a privilege argument?  What's

19   the basis for your position?

20           MR. BLODNICK:  Relevance, burden.  It's relevance

21   and burden, both.  It has nothing to do with this case.

22           THE COURT:  Well, you say it's not relevant --

23           MR. BLODNICK:  He has thirty other companies.  Do

24   you mean we have to produce all those records?

25           THE COURT:  It sounds more like a burden argument

1    to me.

2         MR. BLODNICK:  Then he's going to have to answer

3    questions at a deposition about what the differences were

4    between each of these thirty companies and the defendants

5    herein.  I don't think that's even close to either

6    burdensome or relevant.

7         THE COURT:  Mr. Marks?

8         MR. MARKS:  Yes.  First of all, I don't believe

9    that we have all the K-1s, 1099s from all of these various

10   PC defendants and management companies.  In fact, we don't

11   have near complete tax returns.  That's part of the problem.

12   We may get what they claim is all the returns and we're not

13   going to get all of them.  Even if we do, we're entitled to

14   compare what's on those returns to what Dr. McGee says.

15   Maybe it's the same, but maybe it's not.  If it's not, that

16   is certainly going to be relevant and important.

17        In terms of what -- we see a signature, an

18   endorsement on the back of the check, maybe that money went

19   to Dr. McGee, maybe it didn't.  Maybe it's reimbursement for

20   driving a car, maybe it's income, and that is what's

21   important, is what is income.

22        In terms of -- I didn't hear any really response

23   to this issue of whether -- well, I didn't really follow the

24   response to whether or not Dr. McGee could be beholding;

25   but, the fact of the matter is I think, as I've said, the

1   extent to which he was dependent upon them for income would

2   be relevant.

3        With respect to this issue of other businesses, I

4   guess I'm hearing, essentially, agreement, that comparables

5   are relevant because he's saying our expert should go out

6   and do a comparison of comparable costs associated with

7   services.  He just doesn't want us to do a comparable

8   comparison with Dr. McGee, which sort of seems to me to be

9   the most appropriate comparable to do.  Because if Dr. McGee

10  can get these services somewhere else, that would seem to me

11  to be the most and relevant comparable to do and certainly

12  the kind of evidence that our expert would be most

13  interested.  Remembering, of course, that the standard here

14  isn't relevance.  It's likely to lead to the discovery of

15  relevant evidence.  I think we're certainly past that

16  threshold.

17       So really it comes down to what I'm hearing as

18  burden.  At that point, they've got to do more than say,

19  gee, this is a lot of work.  They've go to do something to

20  say why this is a burden and they haven't done that.  We're

21  not asking for all of the business records of every business

22  that Dr. McGee has ever been involved in.  What we've said

23  is, we want records regarding his ownership income in

24  businesses involving the provision of healthcare services.

25       I understand he's a doctor, but we're not looking

1    for all of those records.  We're not looking for all of his

2    medical records.  We're looking for a very narrow scope of

3    records that would be relevant to what clinics did he own

4    and how much did he make and how did those costs compare.

5    Again --

6              MR. BLODNICK:  May I be heard, your Honor?

7              THE COURT:  Go ahead.

8              MR. BLODNICK:  With regard to motivation, nothing

9    anywhere in any of the court cases that hold the motivation

10   for why a party does something.  The issue is who controls

11   it, not the motivation, but actually who controls it.

12             So his argument as to motivation, it's just a new

13   standard and a new test for Malella that doesn't exist

14   anywhere.

15             Secondly, in regard to telling whether the check

16   was deposited in the bank, you can look at the back of the

17   check and you could see whether it was deposited or not.  If

18   you picked it up for his tax return, there wasn't

19   reimbursement for being a chauffeur.  It was part of his

20   income.  So the tax returns for the professional corporation

21   will show what Dr. McGee got paid for his services and will

22   show what he got paid for reimbursement of expenses.  It

23   will not show what kind of services he rendered for that

24   money, but it will show he got paid for whatever services he

25   rendered to the PC.

1    As far as the comparables go, they're not

2    comparables.  Just because he owned another management

3    company, another PC that ran medical things, there's no

4    showing it's identical.  There's no showing, but I said when

5    they have to get comparables, they have to get comparables

6    to these PCs.  There's no showing anywhere that Dr. McGee's

7    other PCs are either comparable to these PCs.  They may even

8    be in different fields of medicine.  They may not do no-

9    fault work.  There are so many variables that it's

10   ridiculous to say that it's a comparable.  An expert has to

11   analyze these PCs, determine what services were rendered by

12   the management companies, what services were rendered by Dr.

13   McGee and whether they were paid in proportion to the amount

14   of services that they each rendered.

15        The other companies may have very different

16   financial arrangement, different services may have been

17   rendered, different people may have been on different

18   payrolls on one company.  The secretaries may have been on

19   the PC payroll.  On the next PC they may have been on the

20   management company's payroll.  There are so many variables

21   that it's impossible to do that way, in addition to the

22   burden.  It's not relevant and it's burdensome.

23        I'm done, your Honor.

24        THE COURT:  Is everyone still there?

25        MR. BLODNICK:  Yes, your Honor.

1          THE COURT:  With respect to the burden, I really

2     haven't seen any -- I've heard assertions of burden, but I

3     haven't really seen any evidence of the burden.

4          MR. BLODNICK:  Your Honor, I think we should have

5     a chance to make a written motion on this to set forth the

6     burdens and what's involved.  This is not really something

7     for just an oral argument.  I would like to have an

8     opportunity to brief this area and everything else.

9          THE COURT:  Well, I think it has been briefed,

10    hasn't it?

11         MR. MARKS:  It has, your Honor.

12         MR. BLODNICK:  We would have to make a list of all

13    his PCs, explain the differences and everything else.  This

14    is a very involved motion.

15         THE COURT:  Right, but I think you had the

16    opportunity to do that and you didn't do it.  That's part of

17    the problem.

18         MR. BLODNICK:  Because it was so out of line of

19    anything I've ever seen before, I thought the Court would

20    deny it summarily.

21         THE COURT:  Mr. Marks, if we were to do some

22    targeted discovery, just to narrow the burden a little bit,

23    how would you do it to see if this going to lead to the --

24    if it's truly relevant as you say it is?  Can we narrow the

25    request?

1          MR. MARKS:  I guess what we would do is we would

2     have him -- I think the way to do it is, we would have him -

3     - I think the way to do it is, we would have him identify

4     those medical business in which -- his medical businesses,

5     and then we'd have him produce management agreements and

6     general ledgers.

7          MR. BLODNICK:  What time --

8          MR. MARKS:  And the medical -- I'm sorry.  General

9     ledgers, if there are agreements, management agreements for

10    those entities and tax returns.

11         MS. DIGLIO:  What time period?

12         MR. MARKS:  For the period governed by the

13    complaint.

14         MR. BLODNICK:  Your Honor, I think they should be

15    forced to pay the cost of this, if you're going to grant

16    them this relief.  This is a very burdensome thing, and it's

17    going to cost at least $25,000 in additional discovery.

18         THE COURT:  Why?  Why will it cost so much?

19         MR. BLODNICK:  Just figure, you have to -- say he

20    has five other entities.  We have to get five sets of tax

21    returns for how many years does the complaint go back, six,

22    seven years.  So you have thirty or forty tax returns,

23    thirty or forty years of general ledgers.  This is a

24    humongous task.

25         MR. MARKS:  I'm sorry.  It's not.  It's at most a

1    box of documents.  State Farm has produced how many boxes of

2    documents in this case?

3             MS. PRENTICE:  Tens of thousands.

4             MR. MARKS:  State Farm has produced tens of

5    thousands of pages of documents in response to the document

6    requests it's received from defendants.  This is --

7             MR. BLODNICK:  (ui) financial position next to us.

8    We're not in the position to do this.  We don't have that

9    sort of money.

10            MR. MARKS:  It's certainly not more than a box of

11   documents that I'm talking about.

12            THE COURT:  Tell me again the time period.

13            MR. MARKS:  It's the tax returns and general

14   ledgers and some agreements.

15            THE COURT:  Mr. Marks --

16            MR. BLODNICK:  It's thirty years of tax returns

17   and thirty years of general ledgers and thirty years of

18   agreements.

19            THE COURT:  Excuse me just a second.

20            Mr. Marks, what time period would you be satisfied

21   with?  Is there anything less than the full time period for

22   the initial disclosure?

23            MR. MARKS:  The time period of the complaint is --

24   we're not asking for thirty years.  I'm sorry.  The time

25   period of the complaint is 1998 to the present.

1        THE COURT:  Can you do it for a little less than

2   that, at least for starters?

3        MR. BLODNICK:  (Ui) years times five, your Honor,

4   that's times five different entities.  Let's assume he had

5   five other entities.  That's 65 different years we're

6   talking about.

7        THE COURT:  I hear what you're saying.  Mr. Marks,

8   would you be satisfied with a small period at least

9   initially --

10       MR. MARKS:  I suppose -- well --

11       THE COURT:  -- or does that not make sense?

12       MR. MARKS:  I guess I would ask -- why don't I

13   suggest this then as a way to proceed in steps is, if they

14   would start by giving us a list of the entities in which Dr.

15   McGee had an ownership interest from 1998 to the present,

16   and then just produce the documents that we're talking

17   about.  Why don't we say 2002 to 2008, but the list of the

18   entities would cover the entire period.

19       THE COURT:  I understand.  That's sounds

20   reasonable.

21       MS. DIGLIO:  This is Maria Diglio.  What if one of

22   the entities didn't practice any no-fault whatsoever, that

23   wouldn't really be relevant.

24       MR. MARKS:  No, but that's the point.  That's our

25   point.  So if it's providing healthcare services, then

1    that's relevant to us because if he's behaving differently

2    when it's not a no-fault, that's relevant.

3         MR. BLODNICK:  Of course he's behaving

4    differently.  There are different reimbursement rates and

5    different methods of doing business.  When you bill an

6    insurance company and you bill a no-fault provider, you bill

7    differently.  There are different rules and regulations and

8    everything else.

9         MR. MARKS:  Those are all very good arguments that

10   defendants can make to the jury at the appropriate time.

11        Another way to view what's happening is that the

12   reason they're doing that is because the clinics are owned

13   and controlled by lay persons argument that I'll make to the

14   jury.

15        THE COURT:  We're not going to decide who's right

16   on the merits on this point.  The question is whether this

17   is reasonably calculated to lead to the discovery of

18   admissible evidence.  That's the standard for relevance.  I

19   think the burden will be substantially narrowed with the way

20   that Mr. Marks has suggested.  So if you can list the

21   entities in which Dr. McGee had an ownership interest from

22   1998 to the present, and then just produce the documents

23   that he requested for 2002 through 2008 I think that would

24   be satisfactory.

25        MR. BLODNICK:  Your Honor, I would like a hearing

1  on the costs of producing same and the burden of producing

2  it where there should be an allocation of cost, but I think

3  it's unbelievably onerous on Dr. McGee.  Now we're talking

4  after all this is over, they're preparing to serve an

5  amended complaint, if you look at his letter, and we're not

6  going to be dragged into more discovery after the amended

7  complaint.  We're going to have to do this all over again.

8  There has to be some limit to the defendants' ability to

9  defend and everything else.

10      They're now planning an additional lawsuit with

11  additional parties and we're going to be dragged in again,

12  and there's an unlimited end to this thing which is totally

13  unreasonable to the defendants who are not in equal

14  financial position with State Farm.  They're literally

15  bleeding us to death in this case.  If they agree not to

16  amend the complaint, then that might be something different.

17      THE COURT:  You filed your opposition on December

18  15.  It was in your opposition that you had the opportunity

19  to talk about costs and provide some more specificity about

20  that.

21      MR. BLODNICK:  I never thought the Court would

22  even entertain something like this.

23      THE COURT:  Why was it that you agreed to that?

24      MS. DIGLIO:  We've been involved in other cases,

25  your Honor, where this type of discovery has not been

1    allowed.

2          MR. BLODNICK:  We've merged with another firm.

3    Between our two firms, I'd say we've handled at least thirty

4    or forty RICCO cases and this is the first time this has

5    ever been requested.

6          THE COURT:  It's either not been allowed or it's

7     -- your statements are contradictory.

8          MS. DIGLIO:  Well, in my instance it had been

9    requested, I believe by State Farm, in a case several years

10   ago and it was denied.  This type of evidence was denied.

11   The judge ruled that this type of evidence is really

12   something for an expert witness.  If you want to use

13   comparisons, you use comparisons that are truely comparable,

14   so that State Farm should get this kind of evidence from an

15   expert.

16         Whether McGee did something different with some of

17   his other entities doesn't mean anything except that it's

18   different.  It doesn't mean that what he did with these

19   defendant PCs was right or wrong.  It just means what he'd

20   done with them is different than what he does with other

21   entities.  That doesn't make any kind of a difference.  It

22   shouldn't say anything about either one is right or wrong.

23   They are what they are.

24         If plaintiffs want to get an analysis by an expert

25   of whether one or the other is structured incorrectly, then

1    that's what they should do.

2          THE COURT:  Wouldn't they need some discovery to

3    do that though for the experts?

4          MS. DIGLIO:  What I'm saying is, it doesn't make

5    any difference to plaintiff's case what McGee did with his

6    other PCs.  What State Farm has to show is what he did with

7    these PCs is incorrect.  They do that with an expert

8    witness.  They don't do that by showing what McGee did with

9    his other PCs.

10          THE COURT:  I know your argument is that what he

11    did with these other PCs doesn't establish that his

12    relationship here was improper, with the PC defendants was

13    improper, but it does shed some light on it.  If there is an

14    argument, I think Mr. Marks' point is that if he treated

15    them differently, then there may well have been a reason for

16    the differential treatment and an expert would be able to

17    explain what that is.

18          MR. BLODNICK:  Your Honor, suppose one of the

19    other management companies was his sister and there was a

20    different arrangement because it was his sister, you're

21    going to go into all those issues.  In other words, what

22    he's really saying is you open the door to try the second

23    case to determine comparables for this case.  That's what

24    you're opening the door to, which is so costly and so far

25    out that it just -- you're just putting the defendants into

1    bankruptcy.

2           THE COURT:  Well, then I think you're right that I

3    need a little more information on this.  You all have had

4    more experience in the area.  You've had this issue dealt

5    with before.  You know what the costs are.  If you want to

6    file a supplemental letter on this, I'm happy to read it.

7           MR. MARKS:  Judge, if I can.

8           MR. BLODNICK:  (ui)

9           MR. MARKS:  Excuse me, Judge, if I could speak a

10   moment, Mr. Blodnick.

11          Judge, I had not jumped in because I had

12   understood the Court to have ruled.  It's not my habit to

13   argue with the Court's ruling once the Court has entered a

14   ruling.

15          THE COURT:  I'm sorry.  Who is speaking?

16          MR. MARKS:  This is Jonathan Marks, your Honor.

17          THE COURT:  Okay.

18          MR. MARKS:  We have been round and round.  This

19   discovery was served on these defendants in January of 2011,

20   a year ago.  The Court had set a procedure for briefing.

21   They were given an opportunity to brief.  They filed a

22   brief.  They're done.  Now, they're pulling in desperation,

23   it's going to bankrupt us.  It's absolutely -- you know,

24   without citation, without support, without authority.

25   They've had their chance.  It's done.  The Court I think has

1   correctly and appropriately recognized the minimal standard

2   that applies to discovery, which is: is it reasonably

3   calculated to lead to the discovery of admissible evidence,

4   and this clearly is.

5          We have now, at the Court's urging, narrowed it

6   even further.  What is it we're asking for.  We're asking

7   for a list, a list of the medical businesses that Dr. McGee

8   has been involved in.  How long can that possibly take him

9   to come up with.  Then for a four-year period, go find the

10  tax returns, the general ledgers, and the management

11  agreements for six years for three categories of documents.

12  It is, at most, a box of documents in a case in which State

13  Farm has produced tens of thousands of documents.

14         I understand one could argue there's a difference

15  in terms of the resources available.  But even at that

16  level, we're talking about a box of documents.  They have

17  had their opportunity and now they're going to impose added

18  costs on us.  Now we're going to go with a whole new round

19  of briefing, when the opportunity has come and gone.  It is

20  time to move on.  I think the Court has appropriately

21  considered and ruled, and I think we should go on.

22         THE COURT:  Actually, Mr. Marks, I think you're

23  right on that.  2002 to 2008, though, is seven years.

24         MR. MARKS:  I'm sorry, my apologies.

25         MR. BLODNICK:  Your Honor, you're not going to let

1    us submit a letter at least on the costs?

2             THE COURT:  Well, you can submit a letter on the

3    costs.  But I'll tell you, the problem with it is that you

4    really -- that's something that you should have done before,

5    as I said earlier, and it's something that -- and if there

6    were other sorts of cases that were relevant to this, that

7    should have been mentioned, too.

8             MR. BLODNICK:  Your Honor, I was brought on this

9    case in January, so I can't answer.  But I thought the

10   request for these particular documents was made later than

11   that, but I'm not sure.  I may be mistaken.  I did not

12   become involved in this case until about four months ago.

13            THE COURT:  The briefing anyway was December 15th.

14   It was completed by then.  So we're having an argument here

15   and I've got people waiting in the courtroom.  Obviously,

16   this is something that was scheduled, was to have been dealt

17   with, and all the relevant information was supposed to be

18   before the Court.  If there's a burden issue, that issue

19   should have been noted.

20            I mean, I'm looking right now at document 71 and I

21   just don't even see that that argument is even made.

22   There's no way that the Court possibly could have understood

23   that argument and the cost argument.  I think Mr. Marks is

24   right that it's not fair to raise it again.  What's the

25   point of the first opposition if you're not going to put

1   what's important in it?

2          MR. BLODNICK:  Your Honor, you're allowing them to

3   amend the complaint when this is all over.  I think that's

4   equally unfair.  (Ui).

5          THE COURT:  I think we'll take it all one step at

6   a time.

7          MR. BLODNICK:  That puts another round of

8   discovery and everything else.  So why is it so crucial now

9   that we can't have a few more days to put in another

10  response, when everyone else was granted a little more time?

11  If we could just have one more week to respond to this, we

12  would really appreciate it.

13         THE COURT:  What I think -- here's how we'll do

14  it.  Why don't we do it as a motion for reconsideration.

15  We'll do it as a motion for reconsideration.

16         MR. BLODNICK:  Fair enough.  Okay, we'll get it

17  out within a week.

18         MR. MARKS:  Judge, I understand the Court's ruling

19  regarding records, regarding ownership and income at other

20  clinics.  What's the Court's ruling with respect to personal

21  tax returns and bank records?

22         THE COURT:  At this point, I don't really

23  understand what the alternative would be.  As I've seen it,

24  the alternatives have not been persuasive.  So I think the

25  personal -- that can be redacted, however, but the personal

1   tax returns --

2         MR. BLODNICK:  How can they be redacted, your

3   Honor?

4         MS. DIGLIO:  Redacted as to what, your Honor?

5         THE COURT:  Can you both agree as to what will be

6   redacted?  Otherwise, I'll just make it a statement at this

7   point.

8         Mr. Marks, what would you agree to having

9   redacted?

10        MR. MARKS:  I guess -- we're interested in -- we

11  need any portion of the return that discloses income from

12  any source.

13        MS. DIGLIO:  Not any source, any health care

14  service.

15        MR. MARKS:  No, any source.

16        MR. BLODNICK:  Your Honor, that's a total fishing

17  expedition.

18        MS. DIGLIO:  So if you've made investments?

19        MR. MARKS:  We have argued that we want to show

20  what portion of this income is relative to his total income.

21        MR. BLODNICK:  So if he won the lottery, that's

22  relevant to the case?

23        MR. MARKS:  Absolutely.  That's the point.  So if

24  he wants to redact -- I'm not sure what it is they propose

25  to redact.  None of the other defendants have redacted any

1  portion of their tax returns.  If he wants to redact his

2  social security number, if he's got personal identifying

3  information he'd like to redact, that's fine.  If he's got

4  charitable contributions that he'd like to deduct, I think

5  that would be fine.

6          THE COURT:  What about dependents' income or

7  spousal income, if it's a joint return?

8          MR. MARKS:  He could not identify the source of

9  the spousal income, but I think we would need to know the

10  total amount of the spousal income.

11         MS. DIGLIO:  No, no, not spousal income.

12  Absolutely not, your Honor.

13         MR. BLODNICK:  Your Honor, this is an Alice in

14  Wonderland, it really is.

15         MR. MARKS:  Judge --

16         MS. DIGLIO:  How would --

17         THE COURT:  Excuse me, one at a time.  Let me hear

18  from Mr. Marks.

19         MR. MARKS:  Judge, the reason it is relevant is

20  for the reasons that I've articulated, which is Dr. McGee --

21  is Dr. McGee doing what they tell him to, because he depends

22  for his livelihood, in order to put bread on his table, for

23  what the laypersons tell him to do.  Does he depend on them

24  for his income?  And if he's getting -- if his joint family

25  income is coming from some other source or is not -- in

1  other words, if the money that he gets from the true owners

2  is 90% of his income or 95% of his income, then he's doing

3  what they're telling him because he depends on it.  If it's

4  not, then it's not.

5         THE COURT:  So you don't need to know what the

6  source of his spouse's income is.

7         MR. MARKS:  Judge, we do not need -- we do not

8  need to know the source.  So in other words, if they want to

9  redact who the -- who it is -- in other words, the spouse --

10 the name of the employer, the address of the employer -- we

11 don't need to know who the employer is, the name of the

12 employer, the address of the employer.  But the dollar

13 amount that goes to McGee's joint return that is earned from

14 that spouse is relevant.

15        THE COURT:  So what if you just -- what about the

16 bottom line?  Any income earned from management companies

17 and then his total income, just those two kinds of data.

18 Would that be sufficient?

19        MR. MARKS:  Well, no, because we need to know --

20 we need to know the income -- we need to know the total

21 amount of income he earns in any one year, because we want

22 to compare his total income --

23        THE COURT:  Yes.

24        MR. MARKS:  -- to the portion that comes from the

25 businesses at issue.

1    THE COURT:  Right.  So if we have the total amount

2    of income per year and the income from the P.C. management

3    companies -- management P.C.'s, wouldn't that be sufficient.

4        MR. MARKS:  If you include in that anything from a

5    healthcare business in which he was involved, I think that

6    would be agreeable as a starting point.

7        THE COURT:  All right, so you can redact anything

8    other than those three, total income per year, income from

9    the management companies and healthcare businesses.

10       MR. BLODNICK:  What about spousal income?

11       THE COURT:  Well, the total income including they

12   spousal income is the total family income, but you don't

13   have to identify the source of the --

14       MR. BLODNICK:  That's fine?

15       THE COURT:  Okay?

16       MR. MARKS:  Judge, with respect to the bank

17   accounts then, are you ordering production of the bank

18   records?

19       THE COURT:  Yes, unless there's some reasonable

20   redaction that I haven't thought of.

21       MR. BLODNICK:  It's a total invasion of his

22   privacy.

23       THE COURT:  Well, his bank records -- his bank

24   records with respect to what his total income is and the

25   source of income from management companies and healthcare

1   businesses, that's what I think the plaintiff is entitled

2   to.  I'm not quite sure how to redact (ui).

3          MR. BLODNICK:  If he had an attorney in a criminal

4   record or he had (ui) criminal matter, he has to turn that

5   over to them, also, as part of his bank records, that he

6   paid (ui).

7          THE COURT:  I don't believe that's his total

8   income or management income, so no, he wouldn't have to turn

9   that over.

10          MR. BLODNICK:  We're talking about the bank

11   records now, your Honor.

12          THE COURT:  Right, but the bank records should

13   just show what his income is and what he's -- the same kind

14   of information as the tax return.

15          MR. BLODNICK:  Okay, just that information.  Okay,

16   thank you.

17          MR. MARKS:  Well, no, but --

18          THE COURT:  What else do you need, Mr. Marks?

19          MR. MARKS:  Does defendant even have these bank

20   records, because --

21          MS. DIGLIO:  Does McGee have them or do us as

22   attorneys have them?

23          MR. MARKS:  Either, because my impression is that

24   ultimately, we're going to have to go to the bank to get

25   these bank records.

1          MS. DIGLIO:  I haven't inquired with my client.  I

2     think he has certain years of bank records.  I don't know

3     how far back they go.

4          MR. MARKS:  Because coupled with this is a --

5     there's a subpoena directed to the bank for his personal

6     bank records.  We had agreed to withhold that subpoena until

7     this issue was resolved.  What's going to -- the bank --

8     assuming -- I'm guessing we're ultimately going to have to

9     go to the banks because experience tells me it is very

10    unlikely that Dr. McGee has in his possession personal bank

11    records that are going to cover the period.  Frankly, it is

12    considerably less burdensome for the bank to provide these

13    records and less costly for the bank to provide these

14    records, because State Farm pays to get them from the banks.

15         But when you get them from the banks, the banks

16    don't do redactions.  There's just no practical way for that

17    to happen.  There is, however, Judge, in this case -- there

18    is a protective order.  We can agree that all those

19    documents that are produced as McGee's bank records can be

20    stamped confidential.  They will all be confidential

21    pursuant to the protective order, and that should protect

22    whatever privacy concerns counsel is raising.

23         THE COURT:  But what do you need from those bank

24    records?

25         MR. MARKS:  The same type of information that

1   we're talking about here.

2           THE COURT:  Right.  So we're talking about total

3   income per year, income derived from the management

4   companies and income derived from healthcare businesses,

5   correct?

6           MR. MARKS:  That's correct.

7           THE COURT:  So any redactions would have to be in

8   conformity with that.  Anything that does not reflect -- I

9   assume we're talking about bank statements and checks, is

10   that correct, and deposits?

11           MR. MARKS:  That's correct, yes.

12           THE COURT:  Okay.  So, counsel, any redactions

13   would have to be along the lines I just described.

14           MR. MARKS:  Okay.  But, Judge, if we have to go to

15   the banks for bank records --

16           THE COURT:  The banks will --

17           MR. MARKS:  -- the banks will not do those

18   redactions.

19           THE COURT:  I know, so they will have to produce

20   them to the defendants.

21           MR. BLODNICK:  So let them produce the records to

22   us and we'll redact them and produce them to you.

23           MS. DIGLIO:  That would be acceptable to us.

24           MR. BLODNICK:  That's acceptable.

25           MR. MARKS:  Okay.

1          THE COURT:  If that's not satisfactory, then

2     you'll come back to me.

3          MR. MARKS:  All right.  So once we get these

4     records, Judge, we can come back if we deem them

5     insufficient.

6          THE COURT:  Absolutely.  If there's a problem with

7     the redactions or you think too much is redacted or there's

8     information you need.

9          MR. MARKS:  Okay.

10          THE COURT:  The same thing with the personal

11     diaries.  Again, that's going to be -- the personal diary is

12     a difficult thing to deal with.  I don't know what -- well,

13     go ahead.

14          MS. DIGLIO:  Your Honor, this is Maria Diglio.  I

15     don't know exactly what Dr. McGee testified to earlier, but

16     there's no showing -- we don't know from Dr. McGee whether

17     or not he put every single appointment in that diary,

18     whether it's complete, whether he was consistent in putting

19     entries in there.  Not only to mention the fact that,

20     obviously, there's personal information in there that can

21     certainly be redacted, they may not be complete and of no

22     use.

23          So I would suggest that he be examined at his

24     deposition about that personal diary, and if it turns out

25     that yes, he wrote every single appointment and wrote down

1    every single time he went to every single location, then it

2    would be a useful tool for the defendants -- I mean for the

3    plaintiffs.  But at this point, there's no showing that it

4    would be useful as any kind of admissible evidence for the

5    plaintiffs.

6              THE COURT:  Mr. Marks?

7              MR. MARKS:  Judge, that's a wonderful argument to

8    make to the jury about why a particular day of the diary

9    means one thing or means something different.  But this is

10   discovery and the issue is, on any particular day, does the

11   diary show him providing medical services or does it not?

12   That's what we're entitled to see in the diary.  Dr. McGee

13   can testify to his heart's content over what the diary means

14   or doesn't mean, and we can argue about that when we get to

15   trial.  But for purposes of discovery, we're entitled to

16   see.  He's got a contemporaneous document.

17             THE COURT:  Let me just interrupt you for just a

18   second.  Hold on just one second.  So you're looking to see

19   where he does actually say that he's doing medical business,

20   correct?

21             MR. MARKS:  Correct.

22             THE COURT:  So if they want to redact anything,

23   they can redact as much as they want, correct, as long as

24   they don't redact the medical business.  And the more they

25   redact, the stronger your case is, and the less they redact,

1    the stronger their case is.

2              MR. MARKS:  That's absolutely true, Judge.

3              THE COURT:  Okay.  So why can't it be redacted?

4    Why can't he do the redactions?

5              MR. MARKS:  I agree, Judge.  In fact, we're

6    proposing that the only portion of the diary that they have

7    to produce are those entries where he is providing

8    healthcare services or -- just to be clear, or is physically

9    present at any of the P.C. defendants.

10             THE COURT:  Okay, that's granted.

11             MR. BLODNICK:  Okay, we agree to that.

12             MS. DIGLIO:  All right.

13             MR. BLODNICK:  We agree to that, your Honor.

14             THE COURT:  Okay.

15             MR. BLODNICK:  Your Honor, there's one last issue

16   now, all right?

17             THE COURT:  Hold on just one minute, please,

18   because I have some people that have been waiting a while

19   and I think they're actually ready.  Just hold on a second.

20             (Pause in Proceedings)

21             THE COURT:  Go ahead, please.

22             MR. BLODNICK:  The last issue is that we've

23   subpoenaed a bunch of doctors that did independent medical

24   examinations of the records of Dr. McGee, of patients that

25   he (ui), and Mr. Marks has objected to those subpoenas.  At

1    the last phone conference, you asked whether we could reduce

2    the number.  What I would propose is that we examine five

3    doctors.

4            THE COURT:  I'm sorry, how many documents?

5            MR. BLODNICK:  Five doctors.

6            THE COURT:  Five doctors?

7            MR. BLODNICK:  Third party doctors, witnesses.

8    State Farm did that, used (ui) medical examiners to examine

9    the records (ui) Dr. McGee.

10           THE COURT:  And you're agreeing or disagreeing

11   about this?

12           MR. MARKS:  Judge, I think we're disagreeing

13   because as I -- I still have not heard -- I had hoped we

14   were going to talk about this -- I thought we were going to

15   talk about it before the last -- between the last hearing

16   and now, because I thought we were going to hear some

17   articulation as to what possibly this has to do with this

18   case.  We have yet to hear it.  I'm certainly interested to

19   hear what they intend to explore and how it relates to this

20   case but I haven't --

21           MR. BLODNICK:  Do you want me to answer that?

22           THE COURT:  Before you do that, why don't I let --

23   since I have a number of people in this courtroom who need

24   about five or ten minutes of my time, why don't I let you

25   speak on this call to each other and I'll get back to you in

1  a few minutes.

2         MR. BLODNICK:  Judge, I have a time problem, also,

3  at this point.  This call now is going on to the second hour

4  almost completely.  Is there any time we could reschedule

5  this last point, your Honor?

6         THE COURT:  Well, when are you going to speak to

7  each other?

8         MR. BLODNICK:  I could stay on with him for about

9  ten minutes and then I must leave at 4:00.

10        THE COURT:  Okay.

11        MR. BLODNICK:  So could we reschedule with you,

12  your Honor?

13        THE COURT:  We can do this again at 3:00 tomorrow

14  if you want, 3:00 New York time tomorrow.

15        MR. BLODNICK:  Thank you.

16        MR. MARKS:  Just a moment, your Honor.

17        THE COURT:  Is that good for everyone?

18        MS. PRENTICE:  Your Honor, please just give us one

19  moment to check our schedules.

20        THE COURT:  Yes, that's what I'm hoping you will

21  do.  If that's not a good time, I'll find another one.

22        MR. MARKS:  So 3:00 tomorrow New York time?

23        THE COURT:  3:00 New York time.

24        MR. MARKS:  That's fine, your Honor.

25        THE COURT:  Okay.

1          MR. BLODNICK:  Okay, that's fine.

2          THE COURT:  All right, thank you very much.

3          MS. PRENTICE:  Thank you, your Honor.

4          MR. MARKS:  So we're going to stay on.

5          THE COURT:  You're going to stay on the line.  Let

6     me just -- there was one question that I have.  While I was

7     scrolling from screen to screen, something got erased.  For

8     the default motion for the Paez defendants, Fresh Meadows

9     and Medical Management Affiliated, what do you have down as

10    the ruling on that?

11         MS. PRENTICE:  Your Honor, I have down in my notes

12    that they will be given fourteen days from today's date to

13    fully comply.

14         THE COURT:  Okay.

15         MS. PRENTICE:  And if they fail to comply,

16    sanctions will be entered against them at that time.

17         THE COURT:  Good.  Thank you very much.

18         MS. PRENTICE:  Thank you, your Honor.

19                   *  *  *  *  *  *  *  *

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18        I certify that the foregoing is a correct transcript

19   from the electronic sound recording of the proceedings in

20   the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                        January 13, 2012